Follain and others v. Dupré and others.

## ADOLPHE FOLLAIN and others v. ANTOINE DUPRE and others.

Fraud will not be presumed. It cannot, generally, be proved by direct and positive evidence ; but the circumstances going to establish it must be strong, consistent, and calculated to induce the belief that a fraudulent intent existed.

Fraud in obtaining an endorsement, is no defence to an action against the endorser, by one to whom the note had been transferred in the usual course of business, for a good consideration, without notice, unless fraud or collusion can be proved as to him.

It is not indispensable that demand of payment of a note or bill should be made, and notice of non-payment given, by a notary.

Where a plaintiff relies on the protest and certificate of a notary, under the act of 13 March, 1827, to prove a demand of payment and notice of protest, parol evidence is inadmissible to explain, contradict, or add to the written evidence ; nor can a portion of such evidence be used to make out one part of the case, and the testimony of the notary, as to any thing required by law to be inserted in such acts, to make out another part. As to any other facts, the notary is competent. But a plaintiff may offer the protest and certificate in evidence, and the parol testimony of the notary to prove a demand and notice, with the view, in case the protest and certificate should be insufficient under the statute, to rely on the parol evidence alone. If the protest and certificate be imperfect and insufficient under the statute, they are not the best evidence, and, consequently, parol testimony cannot be excluded as secondary.

A notary cannot testify as to any thing which will contradict or strengthen his official acts.

The notary by whom a protest was made and notice given of the protest of a note or bill, is a competent witness to prove the protest and notice. · He is not disqualified by his liability for neglect or mistakes in the discharge of his official duties.

Where a number of interrogatories have been propounded to different witnesses, an exception that they " contain leading questions," without further specification, will be disregarded, as too general.

The acts of 14 March, 1823, and 13 March, 1827, authorising notaries, parish judges, and, in some cases, justices of the peace, to protest and give notice of the protest of bills and notes, have introduced no new rule as to demand of payment, or the diligence to be used in giving notice of protest. They merely introduced a new mode of proof, unknown to the commercial law.

A protest by a notary of a domestic bill or promissory note for non-acceptance or non-payment, and his certificate of notice to the endorser, are inadmissible under the general commercial law. They are only received where there is a statute or local law authorising their admission. By the act of the legislature of this State, of 13th March, 1827, a notary is authorised to do what the holder of the bill or note is required, under the commercial law, to do himself, and to certify the facts officially ; but the mode of proof authorised by the statute is not exclusive.

A presentment of a bill or note for payment, and notice of non-payment given by an agent of the holder, or by any person lawfully in possession for the purpose of demanding payment, is sufficient.

Follain and others v. Dupré and others.

·A notary to whom an inland bill had been given to demand payment, testified, that he called on the day of payment, during the usual business hours, at plaintiff 's counting-house, which was named, on the face of the bill, as the place of payment, but found no one there, and that he waited a short time without seeing any one of whom he could make a demand; that he afterwards sent his clerk to make a demand, who returned the note to him unpaid; and that one of the plaintiffs soon after came to the notary's office, where he demanded payment of him, and was informed that the bill could not be paid: *Held*, that the demand made of one of the plaintiffs at the notary's office, and his answer, show that the note would not have been paid though he had waited longer, or some one been present when he called at the place of payment; that no injury resulted to the endorser; and that the demand was sufficient.

A demand of payment of an inland bill, made by the clerk of a notary to whom the bill had been given for the purpose of making a demand and giving notice in case of dishonor, is sufficient. The notary had a right to appoint a substitute, for whose acts he was answerable. And where, in such a case, the notices of non-payment were made out by the notary, and deposited in the post office by the clerk, the notice will be good.

The provisions of the statute of 13 March, 1827, requiring notice of protest to be sent to an endorser at his usual residence or domicil, are the same as those of the commercial law. The domicil of a citizen being, according to art. 42 of the Civil Code, the parish in which he habitually resides and has his principal establishment, notice must be directed to him there, or sent to some post office within the parish, unless there be a post office nearer to his actual residence in an adjoining parish or State, in which case it may be directed to the latter, the domicil of the endorser being mentioned.

The rule of the commercial law, that a notice of protest must be sent to the post office nearest to the actual residence of the endorser, and that the holder must use due diligence to discover his domicil and the nearest post office, is, so far as it requires that the notice shall be sent to the nearest post office, subject to many exceptions, one of which is where the party to be notified is in the habit of receiving his letters at a more distant office, or by a more circuitous route, and that fact be known. The great object of the law is to give notice in as speedy and convenient manner as it can be done; and when there is a reasonable compliance with this rule it is sufficient.

It is not absolutely necessary that a notice of protest should be directed to an endorser at the post office nearest to his residence, where he receives his letters and papers from two offices, and the difference in their distance from his residence is but little. In such a case, a notice directed to either will be good.

In an action against the endorser of a bill, it was proved that he was in the habit of receiving his letters from two post offices, both of which were in the parish of his domicil, but one about a mile nearer to his residence than the other; that, supposing him to apply at the two offices every mail day, he would receive letters, if sent to him through the farthest office, from ten to eighteen hours sooner than if directed to the nearest; and that he had instructed the postmaster at the farthest office to retain all letters which might come to his office for him: *Held*, that a notice of protest directed to the endorser at the farthest office was sufficient.

Follain and others v. Dupré and others.

Where it is proved that defendant had declared "that his residence is the parish of S——," and, that, by the laws and regulations of the post office department, all letters directed to that parish, without specifying any particular office, are sent to a post office from which he was in the habit of receiving his letters, a notice of protest directed to him, as the endorser of a bill, at that parish, will be sufficient.

APPEAL from the District Court of St. Landry, *King*, J.

GARLAND, J. Two suits, which, by consent of the parties, were cumulated and tried together below, were instituted on eleven promissory notes, by the holders, against the drawers, and first endorser, Jacques Dupré. The first suit is on five notes, all dated the 24th April, 1842: one payable at four months, for $2,400; one at six months, for $4,000; one at eight months, for $4,000; one at nine months, for $4,000; and one at twelve months, for $5,000; making the sum of $19,400, with interest at ten per cent per annum on that sum, from the date of the notes until paid, and $21 50 the costs of protest. The second suit is on six notes: one dated January 1st, 1842, payable at six months from date, for $4,000; one dated January 12th, 1842, at four months, for $4,000; one dated January 14th, at four months, for $2,500; one dated January 18th, at four months, for $2,500; one dated January 20th, at four months, for $4,000; and one dated February 4th, 1842, at four months, for $2,400; making a further sum of $19,400, on which the plaintiffs claim interest, from the time the several aforesaid notes became due; also the sum of thirty two dollars and fifty cents costs of protest of said notes.

The drawers of the notes are not before us, and it is unnecessary to state the defence put in by one of them (Joubertie), as he is not a party to this appeal. The answer of Jacques Dupré, to the demand on the five notes of the 24th of April, 1842, is an acknowledgment that he endorsed them, but he alleges that he was induced to do so through error and fraud, as he supposed they were to be used in renewal of the six notes described in the suit no. 4218, between these parties. He further says, that said notes were not legally presented for payment at maturity and protested, and notice of their non payment given to him, as required by law. The answer to the suit on the six notes, is an admission of the endorsements, but a denial of the legal present-

ment for payment of the notes at maturity, and protest thereof, and notice to the defendant, as endorser.

The evidence admitted on the trial proves, that previous, and up to the month of October, 1840, there existed in the town of Opelousas, a mercantile firm consisting of Dupré, Joubertie & Tinet, who did business under that name. It was dissolved in the last mentioned month, by the death of Tinet, when the other two partners continued the business in the name of Dupré & Joubertie. This firm opened on their books a liquidation account with that which preceded it. On the 24th December, 1840, a settlement of the accounts existing between the plaintiffs, and Dupré, Joubertie & Tinet was made, when it appears from the account filed, that a balance of $18,541 63, was due to the plaintiffs. The account mentions outstanding notes of the firm, on which the plaintiffs are endorsers, to the amount of $13,776 36, the nett proceeds of which, when discounted, were credited to said Dupré, Joubertie & Tinet, and with which they will be charged at maturity. This settlement was of accounts up to some time in the month of October, 1840, although made at a later period; and, among the notes represented as outstanding, were three drawn by the last named firm in liquidation, and endorsed by the defendant Jacques Dupré. The first is dated the 15th of October 1840, from which period to the 10th of August, 1841, the said defendant endorsed for Dupré, Joubertie & Tinet *in liquidation*, twenty four notes, amounting together to $74,500, all of which it appears passed through the hands of the plaintiffs; and the evidence informs us that some others were given, which were sent to Dupré & Joubertie to be given up to their endorser. On the 9th of September, 1841, the defendant, Jacques Dupré, commenced endorsing for his co-defendants, Dupré & Joubertie; and from that time to the 6th of October, 1841, he endorsed, at different times, five notes, amounting to $15,400, and from the 15th of November, 1841, to January 1st, 1842, five other notes, at different dates, amounting to $15,400 more. On and from January 1st, 1842, to the 4th of February following, the six notes sued on in suit no. 4218, were drawn and endorsed, and were evidently intended as renewals of a note of Dupré, Joubertie & Tinet in liquidation, for $4,000, dated August 10th, 1841, and

the series of five notes of Dupré & Joubertie, commencing on
the 9th of September, 1841, and ending on the 6th of October;
but there were, on the 1st of January, 1842, five other notes of
Dupré & Joubertie outstanding, amounting to $15,400, which
matured at different periods, in March and April, 1842. The
firm of Dupré & Joubertie continued until some time in De-
cember, 1841, when it was dissolved, and the plaintiffs notified
thereof soon after.   On the 20th January, 1842, an account cur-
rent was made out by the plaintiffs, with Dupré & Joubertie, and
a balance struck against them of $38,946 66.   This account
was sent to Dupré & Joubertie on the 22d January, 1842, who
acknowledged its receipt on the 25th, and, without saying posi-
tively in their letter that it is correct, they promise to make re-
mittances as fast as they can.   From the evidence, it is further
shown, that the plaintiffs begun to get uneasy about the large
balance owing to them, and became pressing on Dupré & Jou-
bertie to pay, or secure it; and, in the month of April, 1842, as we
infer from a letter of Dupré & Joubertie's of the 24th of that
month, and from the positive testimony of E. Bercier, Degelos,
one of the plaintiffs, visited Opelousas, to have the business set-
tled, or to institute a suit to recover the sum owing.   What took
place between Dupré & Dubertie and Degelos, appears no further
than from what is said in the letter of the former, written by Du-
pré on the 24th of April.   They say that, when Degelos, about
eight days previously, was in Opelousas, they had promised him
their notes, endorsed by Jacques Dupré, for the sum of $19,400,
being about the balance which they owed, deducting the $19,400
of notes which had already been sent and endorsed by Dupré.
That in compliance with this promise, they now send the notes,
and ask the plaintiffs to have them discounted to secure the bal-
ance owing to them as far as they will go; but, as the discount is
to be taken off these notes, they express a fear that the balance of
their account will not be covered, and they ask for further time,
promising to do all they can to settle that balance.   They fur-
ther express a wish, in case they cannot pay the notes first sent
in full, that they may renew them, and they ask a continuance
of the endorsements of the plaintiffs, after that of Dupré.   The
letter concludes by expressing a hope, that no suit will be

brought against them, as they (plaintiffs) are nearly covered by notes endorsed by Dupré to the amount of $38,800.   In this let-were enclosed the five notes sued on, dated April 24th, 1842, payable at four, six, eight, nine and twelve months, amounting to $19,400, each note bearing interest at the rate of ten per cent-um from date until paid.   They were received in New Orleans, on the 26th of April, and their receipt acknowledged on the 27th, as is stated by the witnesses.   This letter Joubertie says he never received or saw, nor did he know of the transmission of the notes on the 24th, by his former partner, Antoine Dupré, al-though he knew of many previously.

At various dates from the 15th to the 23d of May, four of the six notes given in January and February, 1842, fell due,   As the time approached, the witnesses for plaintiffs say, that they be-came very uneasy at not hearing from Dupré & Joubertie, or receiving any funds to pay these notes, or new notes to renew them.   The notes were held by different banks, none of which were making any new discounts.   The other five notes were drawn payable at long periods, with ten per cent interest on their face, which prevented them from being used in bank, and the money market was very tight, so much so, that men of the best established credit, found it difficult to raise money on the best security.   In this state of affairs, on the 8th of May, 1842, the plaintiffs wrote to Dupré & Joubertie again, acknowledging the receipt of their letter of the 24th April, and the notes enclos-ed in it, to about cover the balance of their account ; *"pour cou-vrir approximativement la balance de votre compte chez nous."*   The letter then expresses great regret at not receiving notes to renew those about coming due, and a hope that they may still arrive in time, otherwise they will have to be protested.   They then go on to say that, as to the notes sent in April, they have them in hand, but as their time of payment is so distant, they cannot be discounted in bank, therefore they will consider them as serv-ing to settle their account.   To this proposition Dupré & Jou-bertie seem never to have made any objection.   This letter was sent by mail, and a duplicate by a steamboat.   On the 10th or 11th of May, the plaintiffs, still not hearing any thing from Du-pré & Joubertie, Bellocq, one of them, left New Orleans, and

came with great expedition to Opelousas, bringing with him a triplicate of the letter of the 8th. He did not go to the store where Joubertie was doing business, but went to the dwelling house of Dupré, from whence Dupré sent for J. Bercier, who had been a clerk of Dupré & Joubertie before the dissolution of the firm, and was then in the employ of Joubertie & Vallain. When this witness arrived, he says that he was shown into the garden, where Antoine Dupré and Bellocq were. The former said that he wished him to go out to see his uncle, (the defendant,) and get him to endorse certain notes, and Bellocq told him, if the defendant objected, and should say he had endorsed notes already to renew those coming due, to convince him, or make him understand that it was not so—that those notes had been made for another purpose. Bellocq also requested witness not to let Joubertie know he was there, but no reason is given why he did so. Witness replied, that the business seemed to be somewhat entangled, and he would have nothing to do with it, and that he would not do any thing affecting Joubertie's interest, while he was in his employment, without letting him know it. The request to go, was pressed on the witness, but he again refused, when Bellocq turned to Antoine Dupré and said that he must go himself; and soon after he (Bellocq) set off on his return to New Orleans. Antoine Dupré never did go to get the endorsements required. Bercier told Joubertie of the matter, but what he said, or did, at the time does not appear, further than that he said he knew nothing about it. Bellocq reached New Orleans again on the 17th of May, and all the notes were protested. This, we believe, is a full statement of all the evidence which relates to the question of fraud in obtaining the endorsement of the five notes, dated the 24th April, 1842, and sued on in no. 4217, except the admission that Jacques Dupré is the uncle of Antoine Dupré, and that Joubertie married his grand daughter, and Vallain a niece of his wife.

The evidence in relation to the question of notice is, that the defendant, J. Dupré, has for more than twenty years resided always at the place he now does. During all that time a post office has existed at Opelousas, which is the seat of justice for the parish of St. Landry. It is the principal town in the parish,

in point of population and business. It is the principal post office; all letters addressed " parish of St. Landry," come to the post office in Opelousas, and are, if the post master thinks it proper, sent to other offices; if not, they are kept there until called for. Mr. Dupré, up to the year 1837, always received his letters and newspapers from the office at Opelousas, and resided much nearer to it than to any other office. In that year a post office was established at Washington, a village about six miles from Opelousas, which is, in point of population, proved to be next to Opelousas. It is the principal *landing*, or shipping port for the produce of an extensive section of country, and the merchandize and supplies for the country are debarked there. It is near the road from the residence of Mr. Dupré to one of his plantations; he is frequently there, and often receives his letters from that post office; has got them himself, and sometimes through other persons. The office at Washington was discontinued some short time after it was first established; and in the year 1838, or 1839, re-established, and has been in existence ever since. The post master at Opelousas testifies, that Mr. Dupré often gets his letters from his office, and has instructed him, when they come not to give them to any one but to himself or his servant. He is frequently in the town of Opelousas, and when Dupré and Joubertie were doing business made their store " *his head quarters*." He is a well known citizen, having been for many years in one branch, or the other, of the legislature. It is further shown, that the mail from New Orleans is due at Opelousas on the day of its arrival, at 6 P. M., and that it often arrives before, sometimes at 10 A. M. It remains there until the next morning; generally until dawn of day or sunrise; and it takes an hour or more to carry it to Washington. The road from Opelousas to Washington runs from south to north, nearly straight; the residence of Dupré is to the west of it, and makes an angle, the road being the base of it. A great deal of testimony has been given to prove which post office is the nearest. Some witnesses consider the distance very small, though all say Washington is the nearest. Some are of opinion, not more than four or five hundred yards; others say it is one mile and a half. The roads to both places are practica-

ble, and generally good at all seasons of the year. A surveyor measured the distance from the two places, and found the difference a little over a half mile in favor of the Washington office. He followed, for a part of the distance, an old road to Dupré's, not much used. Another witness measured it also, and pursuing the public road from Opelousas to the point where the road to Dupré's house leaves it, he made the difference a fraction over a mile in favor of the Washington office. The average made from the testimony of all the witnesses makes the difference in favor of the Washington office nearly a mile. One witness says that he rode on horseback from Opelousas to Dupré's house, and from thence to Washington; that he timed himself, and kept as regular a gait as he could, and it took him fifteen minutes more to travel the first distance than the second. The evidence further shows, that Mr. Dupré sometimes took his letters out of the post office at Washington himself, and had also authorised a person there to receive letters for him, and deliver them to him, or to send them by his servant. Many letters came for him by steam boats, and most of his correspondence with New Orleans, it seems, was carried on by that mode, but it is not shown that they carried the mail.

It further appears that the notaries in New Orleans made inquiries as to the place where the notices of protest should be sent, and, in most instances, were told by one or the other of the plaintiffs, that Opelousas was the proper place. Two of the notaries testify that they made inquiries of other persons well known to Mr. Dupré, one of them his agent and factor in the city, who said his residence was in the parish of St. Landry, and one of them says Mr. Dupré so told him in person.

All the notes described in suit no. 4217, and one for $4000, dated the 12th day of January, 1842, and due four months after date, described in no. 4218, were protested by Wm. Christy, a notary public, in New Orleans. Some defects were supposed to exist in his official protests, and his testimony was taken to prove demand of payment, and notice to the endorser. It was then discovered that he had not, himself, made a demand of payment, in person, of any of the notes, but that the demands had been made by one or the other of his clerks, that a protest

had been made out on their report, that a notice, signed by Christy, as notary, was then deposited in the post office by a clerk in due time, directed to the endorser, at Opelousas, or to the parish of St. Landry. Another of the notes, described in suit no. 4218, was protested by Mazureau, a notary, who states that he went to the place where the note was made payable, to wit, the counting house of the plaintiffs. He found no one there. He waited a short time, and left. He met a clerk of plaintiffs' in the street, and spoke to him about the note; he then went to his office, when he either sent for Degelos, one of the plaintiffs, or found him there, presented the note, and was informed that no funds had been provided to pay it. All the other notes were presented for payment by the notaries protesting them in person, the demand refused, and notice made out and put in the post office in New Orleans by said notaries in person, directed to the endorser at Opelousas, or to the parish of St. Landry; and on those notes which purport to have been made in New Orleans, a notice was also put into the post office there, directed to the endorser in that city.

It is further proved, that about the 20th, or 22d of May, 1842, a short time after some of the notes were protested, the defendant, J. Dupré, called at the counting house of the plaintiffs, and inquired how it was that the notes of Dupré & Joubertie, on which he was endorser, had been protested, as he had a short time before endorsed other notes to renew them. Some conversation took place, and Bellocq, one of the plaintiffs, told him he was mistaken in supposing that he had endorsed notes to renew those then falling due, and showed him the letter of Dupré & Joubertie, of the 24th April, 1842. Dupré looked over it, and said, as to the first series of notes described in suit no. 4218, that he would pay them, but that he would not pay the others unless they could make him do it; and soon after he published an advertisement in the papers, warning all persons against taking the five notes, dated 24th April, 1842, in payment, or accepting a transfer of them.

The district judge gave a judgment for the plaintiffs, for $5000, against the endorser and against Dupré & Joubertie, for the amount of the notes dated the 14th and 18th of January,

1842, and payable on the 17th and 21st of May; and on the remainder of the notes, as well as on those two, gave judgment in their favor against Dupré & Joubertie, and in favor of Jacques Dupré, the endorser; from which last judgment the plaintiffs have appealed, and the appellee, J. Dupré, asks us to correct it, by disallowing the sum of $5000 and interest, and giving an absolute judgment in his favor.

The question of fraud in obtaining the endorsement on the five notes dated 24th April, 1842, is the first we shall consider; and a most attentive consideration has been given to the evidence in relation to it. The record is perfectly silent as to the means by which Antoine Dupré induced his uncle to endorse those notes. It does not appear that Degelos, who was in Opelousas some eight days before their date, was a party to any improper or fraudulent means to procure the endorsements; nor that he advised any thing that was illegal or dishonest. The visit of Bellocq in May, and his remarks to Bercier in Antoine Dupré's garden, are the principal reliance of the counsel to establish the fraud and collusion in relation to these notes. But it must be remembered that previously to that visit and those remarks, the notes had been executed, endorsed and sent to New Orleans by Antoine Dupré, acting for his late firm; and in his letter he tells the plaintiffs that the notes are not executed for the purpose of renewing the others, then held by various banks, but for the purpose of having them discounted, and discharging the balance owing to the plaintiffs, on the account current stated in January previously. In this same letter the other series of notes are mentioned, and a hope expressed, that if they cannot be paid in full they can be renewed, and the continuance of the endorsement of plaintiffs is asked to secure that object. It is a well settled principle of our jurisprudence that fraud cannot be presumed.

It cannot, in general, be proved by direct and positive evidence, but the circumstances that go to establish it should be strong, consistent and calculated to induce a reasonable mind to believe that some dishonest and fraudulent intent existed.

There is another principle as well established as the first, that if a party obtain an endorsement to a note by fraud in

himself, and transfers that obligation to an innocent person, without notice, for a good consideration, in the usual course of business, that person can hold it and enforce the payment, unless some fraud or collusion can be proved as to him.

So it may be admitted that the endorsement of Jacques Dupré was obtained by the fraud of Antoine Dupré, yet if the plaintiffs were not participants in that fraud in any way, the endorser is as much bound to pay them the amount of the notes as if his endorsement was honestly obtained.

Jacques Dupré, in putting his endorsement on the notes, and delivering them to Antoine Dupré, trusted him, and if he was deceived it was his own act and imprudence, and an innocent person cannot be made to suffer for it.

That J. Dupré had great confidence in his nephew, and trusted greatly in his integrity and prudence, is shown by the fact, that there are in the record, notes endorsed by J. Dupré, for him and his partner, from the 15th October, 1840, to the 24th April, 1842, a period of about eighteen months, to an amount exceeding $144,000; besides which, the witnesses state that a number of notes were returned to Dupré & Joubertie after being taken up, but to what amount is unknown. That all these notes were not necessary to renew the first five or six, amounting to $19,400, is apparent from an examination of them, and the record shows that, at the date of the six notes sued on in suit no. 4218; there were in circulation five other notes amounting to $15,400, endorsed by Mr. Dupré, which fell due in March and April, 1842; and what is still more remarkable, these five notes correspond precisely in amount with five of the others sued on, and also with the first five notes endorsed by Mr. Dupré in October, and November, 1840. These facts go strongly to show, if there was a fraud practised in obtaining the endorsement on the five notes in question, that it was not the first time it was effected, as it is evident that there were two series of notes out long before those in controversy are dated.

Before proceeding to an examination of the question of the legality of the protest and notice, our attention has been called to a bill of exceptions, taken by the defendant, J. Dupré, to the admission by the judge, of the depositions of the notaries public who demanded payment of the notes and protested them.

The first objection is, that the notaries whose depositions are offered were the same persons alleged to have protested the notes sued on, and that, as such, their parol testimony cannot be admitted " *to explain, to eke out, to perfect,* or to *contradict* their official acts." If the testimony offered was, in fact, received for the purposes above stated, or any one of them, we should not hesitate to say, that the judge erred in admitting it; but we do not understand that it was the object of the counsel for the plaintiffs to use the depositions for any one of the purposes mentioned. It seems from the course pursued on the trial, that the counsel for the plaintiffs wished to make sure of their case, and, therefore, offered the protest and proceedings of the notaries in evidence. If they were regular and legal, and established, according to the statute of March 13th, 1827, a presentment of the notes for payment, and a legal notice to the endorser of a protest for non-payment, then that part of their case was made out; but if it should turn out that the proceedings of the notaries were imperfect, and did not make out their case, then the plaintiffs proposed to make use of their evidence as individuals to prove a demand of payment and notice to the endorser, abandoning the mode of proof authorized by the statute, and falling back on the commercial law, which, we think, they had a right to do. In the 16 La. 286, we said that it was not indispensable that a demand of payment should be made, and notice given, by a notary public. This is a mode of making a demand and giving notice *authorised* by the statute; but we do not conceive that the mode authorised by the commercial law is dispensed with, or repealed. The statutory provision is cumulative, not prohibitory. If the plaintiffs choose to rely on the acts of the notaries as such, they cannot go beyond them and help them out by parol testimony, nor can they use a part of their official acts to make out one part of their case, and make out another part by the parol testimony of the notaries, as to any thing required by law to be inserted in their acts; but of any fact not required by law to be so inserted, a notary is as competent to testify as any other person.

The second ground of objection is, that the notaries are interested in the event of this suit, and, therefore, incompetent;

Follain and others v. Dupré and others.

and reliance is placed on our decision in the 17 La. 386. That decision is, that a notary cannot testify as to any thing which will contradict or strengthen his official acts; but where his act is laid aside, and reliance is placed on his acts to establish a right, we think he can be used as a witness. We cannot see that the notaries examined are directly interested in this case. If any liability may have been created by their acts, that interest is contingent, and is to be considered in weighing their testimony. In the case referred to the notary was himself a party to the suit, which excluded him, if there had existed no other reason.

The third ground of exception, it appears to us, is answered by what we have said upon the first. If the written instruments of the notaries are imperfect and not according to law, then they are not the best evidence that can be procured. On this hypothesis of the counsel the testimony was admissible.

The fourth objection is, that "the interrogatories of the plaintiffs contain leading questions." The plaintiffs have propounded interrogatories to some seven or eight witnesses; to some of them nearly, or quite, a dozen questions are submitted, and altogether nearly one hundred questions are asked. To notice so general an objection as the one taken would impose an almost endless task. No particular question is selected as objectionable, and under so general an exception we cannot pass on the various interrogatories. We are, therefore, of opinion that the judge did not err in receiving the depositions. As a matter of practice it was probably a right which the defendant's counsel had to call on the counsel of the plaintiffs, to state whether they relied on the notarial acts or the depositions to establish their case, so as to enable them properly to direct their defence; but as this course was not pursued it is not necessary to decide that question.

The defendants' counsel have further urged that, as the legislature have pointed our a mode of making protests and giving notices to endorsers, it excludes all other modes, and that protests and notices must be official acts. As to promissory notes and domestic bills of exchange we cannot assent to the argument. This court has long held the opinion, that the acts

of 1823 and 1827, empowering notaries, parish judges, and, in some cases, justices of the peace, to protest and give notices of protest of bills and notes, have not introduced any new rule as to demand of payment, or what constitutes it, nor as to the diligence to be used in giving notice, but merely introduce a mode of proof not known to the commercial law. 6 La. 730. 7 Ibid, 11.

The protest of a notary, for non-acceptance, or non-payment, of a domestic bill of exchange, or promissory note, and his certificate of notice to the endorser, is not received as evidence in any court in any commercial country, unless there be some statute or local law authorising it. The act of 1827 requires (so far as it goes), the notary to do precisely what the holder of the bill or note was required to do under the commercial law, and authorises him to certify it as an officer. This act is received as evidence, and stands in the place of the parol testimony which had to be made before the statute was enacted.

The protests and notices it is said are not in the legal form, and our attention has been called to them particularly. We do not deem it necessary to go into such an examination, as we have laid all the protests out of view, and have formed our opinion upon the depositions given by the various notaries testifying as witnesses. The notes presented for payment by Boudousquie, Ducatel and Pollock, were presented by them as agents of the Citizens' Bank, the Consolidated Association, and the Louisiana State Bank, respectively; they were the property of those institutions; and each witness says that he presented the note entrusted to him, in person, for payment at the place fixed in it. The replies to the demands are given, and the mode of notice stated. Each witness says that he signed the notice himself, and deposited it in the post office in New Orleans, in person, on the day of the protest, directed to the defendant, Jacques Dupré, at Opelousas, or to the parish of St. Landry. Mazureau says that as agent of the Union Bank, he took one of the notes entrusted to him, and went with it to the place of payment, as stated on its face, on the day it was payable; that he found no person in the counting house or office of the plaintiffs, upon whom he could make a demand of payment. That he waited a short time, and, no one coming in, he returned to his office, and after-

wards sent his clerk to make a demand of payment, who return-
ed him the note unpaid.   The witness then saw Degelos in his
(witness') office, and he there demanded payment of him, when
Degelos said, that no funds had been provided to pay it.   He then
made out a notice of protest directed to the defendant, Dupré, at
Opelousas, Louisiana, which he deposited in the post office in
New Orleans, on the day of said demand and protest.   Each of
these persons states what means and acts of diligence he used
to discover the residence of the endorser.   All the other notes
went into the hands of Christy, as the agent of the Bank of Lou-
isiana ; and as it is proved by the depositions of his clerks, that
he did not, in person, present any of the notes for payment, al-
though he so states in his official protest, we put out of view his
deposition, and proceed to consider the case upon the deposi-
tions of Rareshide and Wm. H. Christy.   These witnesses state,
that the notes shown to them, and which are a part of those sued
on, were handed to them, or to one of them, by William Christy,
to be presented for payment at the place mentioned on the face
of the notes, to wit, the counting house of the plaintiffs.   They
each say that, with the note or notes so entrusted respectively
to them, on the day of payment, they went with the note, and
presented it, and they report the name of the person to whom it
was presented, and the reply, with the hour of the day.   They
then returned to the office where they were employed, and no-
tices to the endorser were made out and signed by William
Christy, as notary, directed, in each instance, to the endorser at
Opelousas, Louisiana, and, where the note or notes purported
to be dated in New Orleans, a notice to the endorser, directed
to him in that city, was also deposited, with the notices to Ope-
lousas, in the post office in the city on the day of the protest.
These individuals also state what means and diligence they used
to ascertain the residence of the endorser.

   Leaving out of view, for the present, the question, whether the
notices should have been directed to Opelousas, or Washington,
we shall proceed to consider whether or not the proceedings of
these various individuals in relation to the presentment of the
notes for payment, and the mode of giving notice, was sufficient.
The notes presented by Boudousquie, Ducatel and Pollock stand

precisely on the same ground.  They were the agents of the various banks, that held the notes.  A presentment for payment by an agent for the holder is sufficient, and so is a notice given by an agent to the endorser sufficient to bind him.  A presentment and notice by an entire stranger to a bill or note would not, perhaps, be sufficient; but we have no doubt, that such presentment by, and notice from any one authorised to receive the money is sufficient.  Story on Bills, no. 303.  Chitty on Bills. 1 Hill's N. Y. Reports, 11, 263.  The correct doctrine seems to be, that any person, in whose possession the bill lawfully is for payment, may give notice of dishonor.  Story on Bills, no. 292.

Boudousquie, Ducatel and Pollock therefore were all competent to receive payment, and, in case of refusal, to give notice to the endorser.  Upon the same principle, Mazureau and Christy were also competent to do the same things.  In the case of corporations it is not practicable to present for payment, and to give notice of dishonor, in any other mode than by an agent.  The only particular in which the note in the hands of Mazureau differs from the others, is in the fact, that when he went to the counting house of the plaintiffs to demand payment, he found no one there.  It was during the usual business hours.  He says that he waited a short time, and that, no one coming, he went away.  Had this been the presentment of a bill for acceptance, we feel satisfied it would not be sufficient; and did it stand by itself as a presentment for payment, we should doubt if it would be sufficient; but the note was sent again by a clerk, and by him returned unpaid, and soon after a demand was made on Degelos, which, although not at his counting house, may be taken into consideration, together with his reply, as a circumstance to show that the note would not have been paid had Mazureau waited longer, or some person been present when he called, and, therefore, no injury resulted to the endorser.

The next question is, whether the presentment of the notes for payment by Rareshide and Wm. H. Christy, the clerks of William Christy, be sufficient, and the notices issued in consequence of the non-payment legal and sufficient to bind the endorser.  The notes were entrusted to William Christy, as agent, by the Bank of Louisiana, for the purpose of demanding pay-

ment and giving notice to the endorser. That institution clearly had a right to appoint him its agent, and he had a general authority to do all that was necessary to effect the object. He had authority to appoint a substitute, for whom he was answerable. This clearly authorised Rareshide and Wm. H. Christy to receive the amount of the several notes entrusted to them, and, if they had been paid and the notes given up, we have no doubt it would have been a good payment. They are, therefore, not strangers to the notes, and a presentment by them for payment was good. The notices were made out by Christy, and deposited in the post office by the said clerks, or one of them, as they testify. We suppose there can not be a doubt, that if a note or bill were sent from New York or Boston, by the owner there, to his correspondent or agent, a merchant in New Orleans, that such note or bill might be presented for payment by a clerk of the agent, and, upon his report of the bill not being paid and return of it to his employer by the clerk, that the employer might write a letter notifying an endorser of the non-payment, which might be deposited in the post office by the clerk, and thus bind the endorser, This being true, we are of opinion, that William Christy had a right to make out a notice, and a legal deposit of it in the post office in New Orleans is so far binding on the endorser. Story, in his treatise on Bills, pp. 340–1, says, that the notice must in general come from the holder, or his agent, for notice by an agent is equivalent to notice by the principal; or it may come from some one holding the bill, and interested in having notice given.

We now come to the last question in the case, which is, whether the notices, which were all directed to Jacques Dupré at "Opelousas, Louisiana," or to him, "Parish of St. Landry," be sufficient to bind him; or whether it was indispensable that they should have been directed to him at Washington, because that was the nearest post office to him, and he received a portion of his letters and papers there.

Under some circumstances, the question of notice is one of law and fact; but when there is no dispute about the facts, it is a question of law alone, and the court is the proper tribunal to decide it.

The rule of the commercial law in relation to the notice be-
ing sent to the endorser at the place of his usual residence or
domicil, is precisely the same with our statute of 1827.   Accor-
ding to the Civil Code, art. 42, the domicil of each citizen is the
parish in which he makes his habitual residence and has his
principal establishment.   The parish of St. Landry is, therefore,
the domicil, or residence of the defendant, J. Dupré.   The no-
tice must therefore be directed to him there (3 Robinson, 164),
or sent to some post office within the parish (16 La. 308), or, if
there is a post office nearer in an adjoining parish or State, it
may be sent there, the domicil of the endorser being mentioned.

It is also a rule of the commercial law, that the notice of pro-
test must be sent to the post office nearest to the actual place of
residence of the endorser, and that the holder of the bill or note
shall use due diligence to discover the place of domicil and the
post office nearest to him.   But the rule that the notice must be
sent to the nearest post office, is not one of universal application,
nor unbending; it is subject to many exceptions, one of which
is, if the party is in the habit of receiving his letters at a more
distant office, or by a more circuitous route, and that fact be
known; in such case a notice sent by that route, or to that of-
fice, will be good.   The late work of Judge Story on Bills of
Exchange treats at considerable length on these questions; and
the decisions in different courts in this country and England
show numerous exceptions to the general rule.

The fact is, that almost every case must depend upon its own
circumstances, and, however desirable it may be to have some
fixed rules, the numerous transactions of men founded on, or
connected with bills of exchange and promissory notes, make it
almost impossible to adopt any to which numerous exceptions
must not be made.   The great object of the law is to give the
party notice in as convenient and speedy a manner as it can be
done; and when there is a reasonable compliance with this rule,
it ought to be sufficient to excuse the holder, and bind the en-
dorser.

But the main question in this case is, whether, when the party
receives his letters and papers from two offices, it is absolutely
necessary that the notice should be sent to the one nearest to

him, however small the difference in the distance may be. The counsel for Jacques Dupré contend that this doctrine is clearly settled by the decisions of this court; and they cite two decisions reported in 3 Robinson, pp. 4 and 242, and the case of *Becnel* v. *Tournillon*, 6 Robinson, 500. The Supreme Court of the United States, in 1 Peters, 578, and 2 Peters, 543, have decided that, in such a case, a notice directed to either office is good. The Supreme Court of Pennsylvania have adopted the same rule ; and the Supreme Court of New York, after overruling one of its previous decisions, have decided the same way ; and its judgment has been affirmed by the Court of Errors.

Judge Story also adopts the same principle, in his treatise on Bills, no. 297. We have said that all rules in relation to these questions must be reasonable, and must not be pushed to extremes. If we were to adhere rigidly to the principle held by this court in the cases cited from 3 Robinson, it might soon lead to very ridiculous results. The difference of distance between two post offices and the residence of the endorser, is often very small; and the decision of a case, and the rights of a party might be determined by a difference of a few yards or feet, or by the accuracy of a surveyor's chain, instead of upon the principles of justice, and common sense.

The evidence in the case of *The Mechanics and Traders' Bank* v. *Compton* (3 Robinson 4), is not stated in the opinion. We have, therefore, referred to the record, and find it was proved that Walker, the endorser, was in "*the habit*" of receiving his letters and papers from the Cotile post office, which was three miles, or more, nearer to his residence than Alexandria, where it is proved there was a post office in which he had a box, and where he also received letters and papers; but it was not proved to have been *habitual*. As to the case of *Nicholson* v. *Marders*, 3 Robinson 242, we have not the record before us, but our recollection of the facts is, that there was no post office in the parish of Concordia, but that the two nearest to the defendant were Natchez and Rodney in Mississippi. The greater number of the witnesses testified that Rodney was much nearer to defendant than Natchez ; and the one or two, who testified to the latter place being the nearest, came to the conclusion from the fact

that there were two roads, one of which was across a bend of the river, whilst the main route was longer.

The case of *Becnel* v. *Tournillon* is entirely different from either of the others and the present. The protest in that case was made in the parish of St. John the Baptist. The defendant resided in the parish of Assumption. One notice was directed to him at Donaldsonville, which is in the parish of Ascension; another was directed to him in the parish of Assumption generally, and the evidence showed that it went to the post office at the court house, which was seven or eight miles distant from the the defendant's residence, and that there was a post office in a village called Paincourtville, within three miles of the defendant's residence, and between him and the court house. The mail had to pass this office to get to the court house. An attempt was made to prove that the defendant got his letters and papers from Donaldsonville, six or seven miles distant, but it failed; and no evidence was given to prove that the defendant ever got a letter from the court house office. Under these circumstances we held that the rule of directing the notice to the nearest office must prevail.

From these statements it will be seen that there is a wide difference between the facts of the case relied on and those of the present case, and we must be governed by them.

In the case of the *Exchange Bank* v. *Boyce* (3 Robinson, 306), it was proved that, for about one half of the year, defendant resided in the pine-woods, near to the Cotile post office, and for the remainder near Alexandria; and we held that a notice directed to him at either place would be good. In *Mead* v. *Carnal* (6 Robinson, 73), the evidence was that Boyce resided much nearer to Cotile than to Alexandria, but there was no proof that he received any letters from the former office, and it was proved that all his letters and papers came to Alexandria, and that he had a box in the office there. We held that a notice directed to Alexandria was sufficient to bind him. Again, in the case of *The Bank of Louisiana* v. *Watson* (15 La. 38), the evidence was, that there was an office nearer to the defendant than Baton Rouge, but that he had a box in the office at that place,

and had instructed the post-master to keep all his letters and papers there. We decided that a notice left there was good.

In this case the difference in distance from the two offices to the [defendant's residence is about a mile, and the routes to each are good throughout the year. Letters arriving from New Orleans for J. Dupré, would, by the ordinary course of the mail, reach him, by stopping at Opelousas, from ten to eighteen hours sooner, if he sent or went to the post office on mail days, than if directed to Washington. The post-master had instructions not to deliver letters or papers to any but to J. Dupré or his servant, which we consider a prohibition to that officer to forward them to any other place, which he might have done under his custom of sometimes forwarding letters to individuals, when another post office was nearer to them. Besides this, it is proved that J. Dupré said that his residence was the parish of St. Landry, when asked by one of the witnesses in New Orleans· His agent and factor also gave the same information, and the post-master says that all letters to the parish of St. Landry uniformly come to the office at Opelousas, which is in conformity to the laws and regulations relating to the Post Office department, which laws it is our duty to notice.

The principle decided in the cases in 3 Robinson, pp. 4,242 has, we think, been carried far enough; and as Opelousas is the principal post office in the parish and the seat of justice, and as the difference between the two places is so small, we must consider the notice directed to that place as sufficient.

The judgment of the District Court is, therefore, annulled and reversed, and it is ordered and decreed, that the plaintiffs, Follain, Bellocq & Degelos, do recover of the defendant Jacques Dupré, the sum of thirty eight thousand eight hundred dollars, with interest on nineteen thousand four hundred dollars, part thereof, at the rate of ten per cent per annum, from the 24th day of April, 1842, until paid, and interest on a further sum of nineteen thousand four hundred dollars, at the rate of five per cent per annum, from judicial demand, to wit, the 26th day of the month of October, in the year 1843, until paid, and the costs of suit in both courts.

*Magill, Swayze* and *Benjamin,* for the appellants.

*Voorhies, T. H.,* and *W. B. Lewis,* contrâ.